

**FILED**

**9:42 am, 12/6/24**

**Margaret Botkins**
**Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

STATE OF WYOMING,

      Petitioner,

VS.

DEB HAALAND, in her official capacity
as Secretary of the United States
Department of the Interior;
MARTHA WILLIAMS, in her official
capacity as Director of the United States
Fish and Wildlife Service,

      Respondents.

Case No.  2:23-CV-00092-ABJ

---

## ORDER GRANTING STATE PETITIONER'S REQUEST FOR RELIEF

---

The grizzly bear (*Ursus arctos horribilis*) has enjoyed federally protected status
since its designation in 1975 as a threatened species under the Endangered Species Act
("ESA"). However, the bear's legal fate has hung in the balance for the last seventeen
years due to recurring failed attempts to remove it from the ESA list. The latest
development in this ursine saga occurred in 2022, when the State of Wyoming petitioned
the U.S. Fish and Wildlife Service ("FWS" or "the Service") to designate the Greater
Yellowstone grizzly population as a Distinct Population Segment ("DPS") and delist it
from the ESA. ECF No. 14 at 7. But despite finding in February 2023 that delisting may

1

be warranted and triggering a 12-month statutory deadline for a final determination, FWS has yet to issue a conclusive decision on Wyoming's petition. 88 Fed. Reg. 7660 (Feb. 6, 2023). The instant case arises from Wyoming's request that the Court enforce the ESA's statutory deadlines and require FWS to make a final determination on the Yellowstone grizzly's protected status. ECF No. 1.

## BACKGROUND

### I.    Statutory and Regulatory Background

The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*., was passed in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b). The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Pursuant to the ESA, the Secretary of the Interior (or "the Secretary") must determine which species should be listed as endangered or threatened. *Id.* § 1533. Listed species receive a variety of federal protections. *See id.* § 1538.

Any "interested person" may submit a written petition to list or delist a species as endangered or threatened. 50 C.F.R. § 424.14(a). Within 90 days of receiving a petition, the Secretary must "to the maximum extent practicable… make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the Secretary finds that a petitioned action may be warranted, they must issue a determination within 12

2

months of receiving the petition that either (1) the petitioned action is not warranted, (2) the petitioned action is warranted, or (3) the petitioned action is warranted but precluded by work on higher-priority actions. *Id.* § 1533(b)(3)(B).

In addition to empowering persons to petition to list or delist a species, the ESA includes a citizen-suit provision allowing "any person" to commence a civil suit to enjoin ESA violations or seek relief for failures of the Secretary to perform nondiscretionary duties. 16 U.S.C. §§ 1540(g)(1)(A), (C). The Administrative Procedure Act ("APA") governs the standards for ESA citizen suits claiming improper agency action or inaction, meaning that courts uphold agency decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998) (quoting 5 U.S.C. § 706(2)(A)).

## II.    Factual Background

The grizzly bear historically populated most of western North America, ranging across the continent from central Mexico to Canada and Alaska. 82 Fed. Reg. 30508 (June 30, 2017). However, westward expansion of European settlers caused the bear's rapid extinction, with the estimated grizzly population in the contiguous United States dropping from 50,000-100,000 individuals pre-settlement to a mere 700-800 by 1975. *Id.* Identifying this dramatic decline, the Fish and Wildlife Service ("FWS") in July 1975 listed the grizzly bear as a threatened species under the nascent ESA. *Id.*

Listing the grizzly was largely successful, especially in the Greater Yellowstone Ecosystem. *Id.* Following over thirty years of protections, FWS in 2007 determined the Yellowstone grizzly population to no longer be endangered or threatened. 72 Fed. Reg.

3

14866 (Mar. 29, 2007). However, FWS' resulting rule identifying the Yellowstone grizzly to be a Distinct Population Segment (DPS) and removing it from the ESA list was challenged in the District of Montana, with the court vacating and remanding the rule for insufficient consideration of state, tribal, and federal agencies' conservation strategies as well as failure to evaluate the whitebark pine as a declining food source. *Id.*; *Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009). The Ninth Circuit affirmed the remand in part, blocking the rule pending further consideration from FWS. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011).

After another decade of evaluation, FWS made a second attempt in 2017 to publish a final delisting rule for the Yellowstone grizzly population. 82 Fed. Reg. 30502 (June 30, 2017). The rule became effective a month later. However, on August 1, 2017, the D.C. Circuit issued an opinion affirming the district court's vacatur of a separate 2011 rule finding that the Western Great Lakes gray wolf population was a DPS and delisting it. *Humane Soc'y of United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017). Shortly following the decision, FWS elected to reevaluate its 2017 Yellowstone grizzly delisting rule in order to consider the deficiencies the D.C. Circuit had highlighted in the gray wolf rule. 82 Fed. Reg. 57699 (Dec. 7, 2017). FWS published its resulting Regulatory Review in the Federal Register on April 30, 2018. 83 Fed. Reg. 18737 (Apr. 30, 2018).

The 2017 rule and Regulatory Review both elicited legal challenges. The District of Montana consolidated the six resulting cases and on September 24, 2018, vacated and remanded the rule with an opinion finding that FWS "erred… without further consideration of the impact on other members of the lower-48 grizzly designation" and

4

acted "arbitrarily and capriciously in its application of the five factor threats analysis." *Crow Indian Tribe*, 343 F. Supp. 3d 999 (D. Mont. 2018). Following somewhat complicated appellate proceedings, the Ninth Circuit affirmed in part and remanded in part. *Crow Indian Tribe*, 965 F. 3d 662 (9th Cir. 2020). Specifically, the Ninth Circuit held that "FWS must determine on remand whether there is a sufficiently distinct and protectable remnant population, so that the delisting of the DPS will not further threaten the existence of the remnant." *Id.* at 678. The panel also affirmed the district court's finding that the final rule was arbitrary and capricious because it lacked "concrete, enforceable mechanisms in place to ensure long-term genetic health of the Yellowstone grizzly." *Id.* at 680.

With the delisting again halted and returned to FWS' hands, three states (Wyoming, Montana, and Idaho) separately submitted petitions requesting that FWS promulgate new delisting rules for different grizzly populations. ECF No. 15 at 13-14. Wyoming's petition, submitted in January 2022, requested the same action that FWS had been attempting for the past fifteen years: to establish the Greater Yellowstone Ecosystem grizzly bear as a DPS and remove it from the ESA's Endangered and Threatened Species List. ECF No. 14 at 13. In February 2023, FWS published its required 90-day findings on the three petitions, determining that Wyoming and Montana's petitions presented "substantial scientific or commercial information indicating that the petitioned actions may be warranted" and triggering the 12-month deadline from the date of petition receipt for a final decision. 88 Fed. Reg. 7658 (Feb. 6, 2023). On March 8, 2023, Wyoming sent a sixty-day notice of intent to sue letter to the

Secretary and FWS Director for their alleged violation of the statutory deadlines in 16

U.S.C. § 1533(b)(3)(A), and on May 24, 2023, filed the instant petition for judicial

review. ECF No. 1.

In July 2023, FWS filed a declaration with the Court stating that it expected to

issue its 12-month determination by July 31, 2024. ECF No. 33, Ex. 1 at 3. However, on

July 26, 2024, FWS filed a new declaration stating that it was unable to meet its self-

imposed schedule due to ongoing related litigation in the Federal District of Idaho as well

as the State of Montana's own initial steps in suing FWS over its failure to issue a timely

response to *Montana*'s grizzly delisting petition. *Id.* at 4–5. Finally, FWS also indicated

that it was preparing a proposed rule draft to revise or remove the *entire* ESA listing of

grizzly bears in the lower 48 states. *Id*. Due to necessary coordination between the

pending rules and litigation, FWS communicated a new expected date for its final

determination on Wyoming's petition of January 31, 2025. *Id*.

### LEGAL STANDARD

Plaintiffs (or petitioners) must demonstrate their standing under Article III of the

Constitution to show that a case or controversy exists and invoke the Court's jurisdiction.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing has three necessary

prongs. First, the plaintiff must have suffered an "injury in fact" that is (a) concrete and

particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.*

(quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). A risk of future harm may

create a sufficient injury, but the injury must be "certainly impending." *Clapper v.

Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (stating that allegations of possible future

injury are too speculative). Second, there must be a causal connection between the injury and the conduct at issue (meaning the injury must be fairly traceable to the challenged action). *Lujan*, 504 U.S. at 560. Finally, it must be likely rather than merely speculative that the injury will be redressed by a favorable judicial decision. *Id.* at 561.

For standing purposes, both tangible and intangible injuries may qualify as sufficiently concrete under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Traditional tangible harms include physical and monetary injuries, while intangible harms may include reputational damage, disclosure of private information, intrusion upon seclusion, or Constitutional violations like free speech infringement. *Id.* (collecting cases). In the environmental context, courts have long recognized injuries reflecting aesthetic, conservational, and recreational values, so long as they remain sufficiently particularized to the party seeking review. *See Sierra Club v. Morton*, 405 U.S. 727, 738 (1972); *Lujan*, 504 U.S. at 562–63.

While injuries may be intangible, they must be more than mere statutory or procedural violations. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009). Rather, "[o]nly a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* (quoting *Lujan*, 504 U.S. at 572). Moreover, while Congress may identify and elevate intangible harms to the status of legally cognizable injuries, a plaintiff does not automatically satisfy the injury-in-fact requirement solely

7

because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. In brief, "under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.

A petitioner's burden to demonstrate standing changes at each stage of litigation, mapping onto the requisite standard for other evidence. *Lujan*, 504 U.S. at 561. General factual allegations are sufficient at the pleading stage, while once the case progresses, the petitioner must "set forth" by affidavit or other evidence "specific facts." *Id*. In many administrative cases, evidence in the administrative record is sufficient to establish standing. *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002); *US Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1164–65 (10th Cir. 2012). Petitioners may also supplement the administrative record with other evidence to support their standing. *Sierra Club*, 292 F.3d at 899.

## ANALYSIS

### I.   Wyoming has standing to bring its claim.

Wyoming offers two primary theories for standing. First, the State asserts that FWS' failure to meet the statutory twelve-month deadline for a final determination on the petition to delist is a concrete harm in itself, meeting the injury in fact requirement without any further demonstration required. ECF No. 16 at 13–14; ECF No. 29 at 12–14; ECF No. 31 at 7–8. In the alternative, the State argues that FWS' delay has concretely injured Wyoming's sovereign interest in managing wildlife within its borders by

8

improperly extending the ESA's federal preemption of Wyoming's grizzly management laws. ECF No. 16 at 14–15; ECF No. 29 at 14–17; ECF No. 31 at 9–10. While the State's assertion of a raw statutory injury fails, the Court recognizes its standing from injury to sovereign interests during the delay period.

### a. The Court's standing analysis is limited to the evidentiary record but may include judicially noticeable facts.

When evaluating standing, the reviewing court may consider only the evidence that appears affirmatively in the record and may not consider argumentation or assertions in the briefings. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 536–37 (1986) (stating that "because it is not sufficient that jurisdiction may be inferred argumentatively from averments in the pleadings… it follows that the necessary factual predicate may not be gleaned from the briefs and arguments themselves." (internal quotations omitted)); *New Mexico Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 805 (10th Cir. 2016).

Fed. R. Evid. 201 allows courts to take judicial notice of facts "at any stage of the proceeding" if the facts are "not subject to reasonable dispute." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) (quoting Fed. R. Evid. 201). Judicial notice must be taken of relevant contents of the Federal Register, while the Court may take judicial notice of state statutes and information on government websites. 44 U.S.C. § 1507; *United States v. Coffman*, 638 F.2d 192, 194 (10th Cir. 1980); *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1266 n.2 (10th Cir. 2002); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009). Caselaw

9

also indicates that judicially noticed facts may be used to establish standing. *See Maine v. Norton*, 257 Supp.2d 357, 373 (D. Me. 2003) (relying on judicially noticed facts about federal preemption to establish state standing); *Wiener v. MIB Grp., Inc.*, 86 F.4th 76, 83 (1st Cir. 2023) (citing *Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020)) (finding that when reviewing a district court's decision to dismiss for lack of standing, the circuit court considers "facts susceptible to judicial notice"); *Eliason v. United States*, No. 1:24-CV-00095, 2024 WL 3842499 (D. Utah July 26, 2024), *report and recommendation adopted*, No. 1:24-CV-00095-RJS-DBP, 2024 WL 4367417 (D. Utah Oct. 1, 2024) (finding no standing due to judicially noticed facts).

Here, Wyoming has failed to attach any evidence outside of the administrative record. However, the State argues that the contents of the administrative record, combined with judicially noticeable evidence from sources like the Federal Register and relevant state statutes, are sufficient to prove standing. ECF No. 29 at 8, 12–14. The Court will therefore consider the scope of the evidentiary record as including these sources.

      **b.  Wyoming cannot assert standing using only the administrative record and FWS' statutory violation.**

          **i.  The administrative record demonstrates only FWS' statutory violation.**

Without considering judicially noticeable facts, the record as-is establishes only FWS' statutory violation. The administrative record indicates that Wyoming submitted its petition to delist on January 10, 2022 (Doc. FWS00015); that FWS found the petition to

present substantial scientific or commercial information indicating that delisting may be

warranted (Doc. FWS00052–67); that 16 U.S.C. § 1533(b)(3)(B) requires FWS to make a

final determination on the petition to delist within twelve months of receiving it (Doc.

FWS00073); that the requisite twelve month deadline in this instance was January 21,

2023 (Doc. FWS00074); and that the Service both failed to meet that deadline and

continues to violate it at the time of this Order (Doc. FWS 00073–77;  ECF No. 33, Ex.

1). These specific facts demonstrate that FWS failed to comply with its legal obligations,

allowing the Court to analyze Wyoming's potential standing based on this statutory

violation.

Despite Wyoming's arguments, the administrative record as it exists offers no

further evidence of injury. The State asserts that FWS' failure to respond to Wyoming's

petition in time injured its sovereign interests in managing the wildlife within its

boundaries by allowing federal law to wrongfully preempt Wyoming's state law during

the delay period. ECF No. 31 at 12–13. Indeed, "[f]ederal regulatory action that preempts

state law creates a sufficient injury-in-fact" to demonstrate standing. *Wyoming ex rel.

Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008). But the administrative

record offers no clear evidence of the State's sovereign interests and federal preemption

thereof. Apart from the already discussed evidence of the procedural violation, the State's

only other affirmative citations to the administrative record speak to its planned *post-

delisting* grizzly bear management laws and inter-state agreements. *See* ECF No. 29 at

17; Doc. FWS_000001–14; Doc. FWS_00033–35. These documents demonstrate only

that the State has hypothetical future plans for grizzly management should FWS deem

11

delisting appropriate (which it indicates it "will amend... as needed" upon delisting) rather than describe and explain federal ESA laws' preemption of present state management structures and that preemption's injury to the State's sovereign interests. *Id*.

Moreover, while the State is correct in asserting that the Court may look to other evidence in the administrative record to determine standing, the State's own cited case for that point also concludes that it is "emphatically 'not this court's duty to scour without guidance a voluminous record for evidence supporting [a litigant's] theory.'" *New Mexico Off-Highway Vehicle All.*, 645 F. App'x at 803 (quoting *United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010)); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (per curiam)) ("Judges are not like pigs, hunting for truffles buried in [the record]"); *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir.2008) ("[R]eading a record should not be like a game of Where's Waldo?"). Still, the Court's own independent review of the administrative record has revealed no evidence sufficient to prove the State's alleged injury.

### ii. FWS' statutory violation is not a sufficient injury-in-fact to demonstrate standing.

FWS' statutory violation has undoubtedly caused the petitioner procedural harm. 16 U.S.C. § 1533(b)(3)(B) was clearly established to create a nondiscretionary deadline by which time a petitioner under the ESA is entitled to an answer. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. At its core, the statutory provision at issue is a procedural one, governing the

12

time and manner of agency action rather than substance. *See Nat. Res. Def. Council v. Bodine*, 471 F. Supp. 3d 524, 537 (S.D.N.Y. 2020) (finding that EPA's failure to issue a timely response to a rulemaking petition was a procedural violation). FWS' violation here therefore cannot form an injury-in-fact that confers standing by itself.

While the State acknowledges the procedural nature of the dispute, it asserts that the procedural right is designed to protect Wyoming's concrete interest in receiving a final determination and thus is sufficient for standing. ECF No. 29 at 13; ECF No. 31 at 7–8. To be sure, where a procedural or statutory right is tied to a concrete interest, violation of that right may confer standing. *See Spokeo*, 578 U.S. at 341–42. Yet that concrete interest – and the injury to it – must exist independently from any statutory creation of Congress. As the Supreme Court instructed in *TransUnion*, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III… we cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." 594 U.S. at 426. In other words, "under Article III, an injury in law is not an injury in fact." *Id*. at 427. Here, FWS' statutory violation is an injury in no more than law. The ESA provision under which Wyoming sought relief may be separate from the statutory deadline by which FWS was required to respond to the State's petition, but both are pure creations of Congress. *See* 16 U.S.C. §§ 1540(g)(1)(A); 16 U.S.C. § 1533(b)(3)(B). Without demonstrating a concrete harm separate from these statutory injuries, Wyoming would therefore lack standing to bring this case.

c. **Wyoming successfully asserts standing via judicially noticeable facts demonstrating federal preemption of state wildlife management.**

i. **Judicially noticeable facts establish that federal ESA laws preempt Wyoming's state management structures.**

In the alternative to its theory of standing based purely on FWS' procedural violation, Wyoming also asserts that evidence from judicially noticeable sources including Federal Register notices, Wyoming state statutes, and the Wyoming Game and Fish Department website demonstrate that the State has suffered an injury-in-fact to its sovereign interests. ECF No. 29 at 8. Specifically, Wyoming invokes the state legislature's declarations that "all wildlife in Wyoming is the property of the State" and that as a policy matter, the State will "provide an adequate and flexible system for control, propagation, management, protection and regulation of all Wyoming wildlife," as well as Wyoming's "comprehensive statutory scheme to regulate wildlife… including grizzly bears." ECF No. 29 at 15; Wyo. Stat. Ann. § 23-1-103; *Wyo. Statutes Annotated* Title 23 (LexisNexis 2023); Wyo. Stat. Ann. § 23-1-101(a)(xiii) (defining "wildlife" as including "all wild mammals"). The State also directs the Court to the grizzly bear's original threatened status listing under the ESA in the Federal Register and the ESA's language stating that it preempts and voids any conflicting state law or regulation. ECF No. 29 at 15; 40 Fed. Reg. 31743-31736 (July 28, 1975); 16 U.S.C. § 1535(f). The Court agrees that taken together, these pieces of evidence indicate that the State's capacity to enact and enforce its own legal codes managing the Wyoming grizzly bear population has been disrupted by federal preemption from the ESA.

14

The Court also agrees that in this instance, judicial notice of these facts is proper.

Courts must take judicial notice of information in the Federal Register and may take

judicial notice of state statutes. 44 U.S.C. § 1507; *United States v. Coffman*, 638 F.2d

192, 194 (10th Cir. 1980); *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1266 n.2

(10th Cir. 2002). Moreover, Federal Respondents do not object to the Court's taking this

step here. ECF No. 30 at 10. The Court will therefore consider federal ESA preemption

of Wyoming's wildlife management capacities as part of the evidentiary record for the

purposes of analyzing standing.

### ii. Wyoming demonstrates a concrete injury-in-fact through federal preemption during FWS' improper delay.

To demonstrate standing, a plaintiff must first show they have suffered an "injury

in fact" that is (a) concrete and particularized and (b) "actual or imminent, not

'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Lyons*, 461 U.S. at 102).

Here, Wyoming successfully characterizes its injury-in-fact as a concrete, ongoing injury

to sovereign interests through current federal preemption of state wildlife management

capacities. Specifically, the State asserts that (1) it has a sovereign interest in managing

wildlife within its borders and in enacting and enforcing its own legal codes, (2) its

capacity to do those things has been halted by federal ESA preemption of state laws, and

(3) that preemption has improperly continued during the current delay, causing a concrete

injury-in-fact. ECF No. 29 at 14–18. As already discussed, the Court takes judicial notice

of the ESA's preemption of Wyoming's wildlife management capacities. This

preemption, coupled with the delay and statutory violation, creates a cognizable injury for standing purposes.

The Supreme Court's holding in *Massachusetts v. EPA* firmly established that due to their unique sovereign prerogatives, states are entitled to "special solicitude" in standing analyses. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007). This special solicitude "does *not* eliminate the state petitioner's obligation to establish a concrete injury." *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012) (quoting *Del. Dep't of Natural Res. & Envt'l Control v. F.E.R.C.*, 558 F.3d 575, 579 n. 6 (D.C. Cir. 2009). In this case, however, those very same sovereign prerogatives also fulfill this obligation. States have a "legally protected sovereign interest" in their ability to create and enforce a legal code over entities within their boundaries, as well as a sovereign interest in regulating in-state wildlife and natural resources.[1] *Wyoming ex rel. Crank v. United States*, 539 F.3d at 1242 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 206 (1999). Federal regulatory action that interferes with those state sovereign interests creates a sufficient injury-in-fact to prove standing. *See Wyoming ex rel. Crank*, 539 F.3d at 1242; *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989); *Maine v. Norton*, 257 F. Supp. 2d 357 (D. Me. 2003).

---

[1] This state sovereign interest in regulating wildlife and natural resources is considered here for standing purposes only, and the Court refrains from endorsing any theory of state *ownership* of animals and resources. The Supreme Court in *Hughes v. Oklahoma* notably held that state "ownership" of wild animals was merely a "19th century legal fiction" that was "pure fantasy." 441 U.S. 322, 335 (1979). Moreover, state sovereign interests in wildlife and natural resources are limited by external constraints such as pre-existing and continuing rights to the same as recognized by treaty. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. 172; *Herrera v. Wyoming*, 587 U.S. 329 (2019).

As a state, Wyoming has sovereign interests in enacting and enforcing its legal code and in managing wildlife within its boundaries. The State has recognized these interests independently, declaring that "all wildlife in Wyoming is the property of the State" and enacting a comprehensive statutory regime to manage it. ECF No. 29 at 15. By preempting and voiding any conflicting state law or regulation, FWS' listing of the grizzly bear under the ESA therefore interferes with Wyoming's sovereign interests.

Importantly, however, Wyoming's injury is cognizable in this instance because of the delay rather than the ESA listing on its own. As this Court previously held in the context of gray wolves, Congress' passage of the ESA altered the federal-state legal regime to "contravene Wyoming's purported sovereignty to regulate endangered and threatened species." *Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, 1230 (D. Wyo. 2005), *aff'd sub nom. State of Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006). Consistent with that ruling, the Court today does not go so far as to hold that any federal preemption related to the ESA creates grounds for a state to sue on a sovereign interference theory. Rather, FWS' delay here has explicitly exceeded the bounds of its authority pursuant to the ESA, making the preemption from which the State *currently* suffers an adequate injury-in-fact. Put differently, the Court recognizes the State's claimed injury to sovereignty as sufficient for standing due to its pairing with FWS' statutory violation, not due to either component alone.

### iii. Wyoming's injury is fairly traceable to FWS' delay.

The second prong of standing requires that there be a causal connection between the injury and the conduct at issue (meaning the injury must be fairly traceable to the

challenged action). *Lujan*, 504 U.S. at 560. This standard requires that a plaintiff show its injury was "not the result of the independent action of some third party not before the court," but does *not* require the plaintiff to establish that the defendant was the proximate cause of its injury or that a "defendant's actions are the very last step in the chain of causation." *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 814 (10th Cir. 2021); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005); *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

The State's injuries meet this requirement. As discussed, the initial listing of the grizzly bear under the ESA interfered with Wyoming's sovereign interests in passing and enforcing laws and managing wildlife within its borders. FWS' delay has extended that interference past the time contemplated by federal statutory regimes. *See* 16 U.S.C. § 1533(b)(3)(B). For this reason (and contrary to Federal Respondents' assertions), the State's current preemption-based injuries are directly traceable to the delay itself. *See* ECF No. 30 at 10 – 11 (arguing that federal preemption here cannot confer standing because it stems from the ESA rather than the delay).

Causation here also draws support from the standing theories frequently asserted by plaintiffs in other ESA deadline cases. Litigants regularly demonstrate standing by showing that they have a concrete interest in a certain threatened species, with that interest harmed by FWS' failure to make a timely decision on listing petitions. *See, e.g., Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171–72 (9th Cir. 2002); *Biodiversity Legal Found. v. Babbitt*, 63 F. Supp.2d 31, 33 (D.D.C. 1999). In these cases, any delay results in continued threats to the species' existence, compounding the

18

plaintiffs' injury. FWS' delay here results in continued improper preemption of
Wyoming's sovereign interests, similarly making the State's injury fairly traceable to the
conduct at issue.

Finally, Federal Respondents' arguments that causation is defeated by Wyoming's
own culpability do not pass muster. ECF No 15 at 25. First, Respondents fail to provide
detail as to the State's specific actions that may have "contributed to [the] delay by its
reluctance to address the Ninth Circuit's instruction on recalibration." *Id.* Furthermore,
even State actions that *did* contribute to the delay to some extent would not defeat this
prong. Causation does not require a plaintiff to establish that the defendant was the
proximate cause of the injury, and causation for standing purposes is generally distinct
from causation in tort law. *See Utah Physicians for a Healthy Env't v. Diesel Power
Gear, LLC*, 21 F.4th 1229, 1242 (10th Cir. 2021). For this reason, Respondents'
argument also fails to the extent it may be attempting to import a tort theory of
contributory negligence to the issue at hand.

### iv.   Judicial relief will redress Wyoming's injury from wrongful preemption.

Last, standing requires that it is likely rather than merely speculative that the
petitioner's injury will be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at
561. Redressability and causation are often "flip sides of the same coin," as "if a
defendant's action causes an injury, enjoining the action or awarding damages for the
action will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic
Med.*, 602 U.S. 367, 381 (2024). Still, the requirements "remain distinct and must be

separately met." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1224 (10th Cir.

2008). Importantly, the redressability requirement is relaxed when a petitioner asserts a

concrete injury stemming from a procedural violation. *See Lujan*, 504 U.S. at n.7.[2] In

such situations, the petitioner "need demonstrate only that 'the procedural step was

connected to the substantive result,' not that 'the agency would have reached a different

substantive result' but for the alleged procedural error." *Sierra Club v. FERC*, 827 F.3d

59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C.

Cir. 2013).

Here, Wyoming has adequately demonstrated redressability under the relaxed

standard associated with procedural harms. The State need not (nor could it) prove that

FWS would have certainly granted its petition had it met the statutory deadline. *See*

*FERC*, 827 F.3d at 65. Rather, it must simply show that FWS' procedural violation is

connected to the substantive injury of federal preemption. The State meets this burden.

*See* ECF No. 29 at 19 (stating that a favorable judicial decision would likely "redress the

injuries in fact to the State's sovereign interests" as it would "force [FWS] to either grant

the petition to delist or to deny the petition").

Furthermore, any final decision would redress the State's injury insofar as the

harm stems from the Service's improper delay. Should FWS grant Wyoming's petition, it

will delist the grizzly bear and return management decisions to the State, thereby ending

---

[2] In *Lujan*, the Supreme Court gave the example of a person "living adjacent to the site for proposed construction of a federally licensed dam," stating that he would have "standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan*, 504 U.S. at n.7.

any interference with Wyoming's sovereign authority. On the other hand, a denial of

Wyoming's petition would end the Service's period of statutory violation and result in

federal law *properly* preempting state interests in accordance with Congress' express

parameters.

## II.   The Court grants the State's requested relief on the merits.

As Wyoming has established standing to bring its petition, the Court now moves

to the merits of its request. FWS does not contest that it violated its statutory duty to

make a 12-month finding on Wyoming's petition, but requests that the Court exercise its

discretion to provide the Service sufficient time to issue its decision without being

rushed. ECF No. 15 at 27. Meanwhile Wyoming requests that the Court require FWS to

make a final determination within one month of this decision and retain jurisdiction over

the case until FWS has fully complied with the Court's order. ECF No. 14 at 26–27.

### a.   FWS must issue its 12-month finding within 45 days of this ruling.

The APA governs the standards for ESA citizen suits claiming improper agency

action or inaction, meaning that the Court here considers whether FWS' actions are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the

law." *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998)

(quoting 5 U.S.C. § 706(2)(A)). Furthermore, "when an entity governed by the APA fails

to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency

action and courts, upon proper application, must compel the agency to act." *Forest

Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). FWS' failure to comply with

21

its deadline creates exactly such an unlawful withholding of agency action, meaning the Court must compel it to act.

As acknowledged by all parties, courts have broad equitable discretion to fashion relief in cases of "effectuating the congressional objective incorporated in regulatory legislation." *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974). This discretion is confirmed by the specific language of the ESA's citizen-suit provision, which grants district courts jurisdiction to "enforce any [ESA] provision or regulation, or to order the Secretary to perform such act or duty" but does not prescribe any specific relief or require certain deadlines be met. 16 U.S.C. § 1540(g)(1)(C). Moreover, while courts may require agencies to take overdue mandatory actions by a certain time, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls [on] him 'to do an impossibility.'" *Train*, 510 F.2d at 713. As such, courts must ensure it is feasible for agencies to comply with any schedules set.

Here, the Court finds it proper to require FWS to issue its 12-month finding within 45 days of this Order. To be sure, this deadline will allow FWS to take its mandatory action nearly two years after it was initially due, as well as within a mere few weeks of the schedule it already indicated it could meet on its own. However, given the agency's staffing constraints, the complex requirements of processing information and coordinating work with other litigation and rulemakings, and the importance of a well-reasoned final determination to both federal and state interests, it would be unreasonable to require the Service to issue a sooner finding. *See* ECF No. 15 at 33–35; ECF No. 33,

22

Ex. 1. Moreover, a 45-day Court-imposed deadline will prevent the Service from again failing to meet its own internal schedule, as it already did in July 2024.

### b. The Court will retain jurisdiction over this case until FWS issues its finding.

In instances of unreasonable delay of agency action or failure to comply with a statutory deadline, courts may also retain jurisdiction pending completion of the required action. *See Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008); *Cobell v. Norton*, 240 F.3d 1081, 1107 (D.C. Cir. 2001); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 556 (D.C. Cir. 1999). Here, Wyoming has requested that the Court retain jurisdiction over this case. Given the length of the delay at issue and FWS' failure to meet prior schedules that it previously set, the Court grants the State's request to retain continuing jurisdiction until FWS issues its final determination.

### CONCLUSION

Both parties' opening briefs in this case invoked the prairie hailstorm as a quintessentially western example of an inescapable phenomenon. The analogy is equally apt for standing requirements. No matter their identity or status, any party seeking relief in federal court must meet the threshold of demonstrating injury, causation, and redressability. Here, the State of Wyoming has come dangerously close to risking the storm unprotected, refusing to supplement the administrative record with affidavits that would allow the Court to consider its jurisdictional requirements more easily. But the State's invocation of judicially noticeable facts has found it a last-minute shelter, convincing the Court of its capacity to hear this case and grant the requested remedy.

23

In any future petitions, the Court recommends that the State focus on clearly demonstrating necessary threshold elements like standing in its opening brief. While the State's eventual reliance on judicially noticeable facts sufficed here, this approach may not always succeed. Had the State simply attached affidavits detailing its injury to its petition, both the parties and the Court could have saved valuable time spent analyzing standing and proceeded to the merits far more efficiently. Instead of taking these basic steps, the State here inexplicably chose to spend multiple pages of its opening brief fantasizing about customized relief like demanding public apologies from federal officials – a remedy it never even requested. The Court requests that the State refrain from including such pointless musings in the future and be more purposeful about use of all parties' and the public's resources.

Regardless, this case has – at least for now – reached its conclusion. While the Court is cognizant of the heavy burdens that administrative agencies like FWS must carry, the Service's duty to respond to Wyoming's petition was non-discretionary. Now, nearly two full years since its obligation came due, FWS must issue its finding and determine the next chapter of the grizzly bear's legal story.

Therefore, **IT IS HEREBY ORDERED** that Secretary Haaland and Director Williams must make their required 12-month determination on Wyoming's January 2022 *Petition to Establish the Greater Yellowstone Ecosystem (GYE) Grizzly Bear (Ursus arctos horribilis) Distinct Population Segment (DPS) and Remove the GYE Grizzly Bear DPS from the Federal List of Endangered and Threatened Species* within forty-five (45)

days from the entry of this Order. The Court will retain jurisdiction over this case until

FWS' obligations are discharged.

Dated this __6th__ day of December, 2024.

Alan B. Johnson
United States District Judge